ARNOLDO CASILLAS, ESQ., SBN 158519
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., Third Floor
Long Beach, CA 90807
Tel:  (562) 203-3030
Fax: (323) 297-2833
Email: acasillas@casillaslegal.com

Attorneys for Plaintiff: Guillermo Sanchez

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| Guillermo Sanchez, | ) **Case No. _____** |
| | ) |
| Plaintiff, | ) **COMPLAINT FOR DAMAGES** |
| | ) |
| vs. | ) **1. 42 U.S.C. § 1983, DUE PROCESS** |
| | ) **VIOLATIONS** |
| | ) |
| Warren Stanley, Daniel Minor, | ) **2. 42 U.S.C. § 1983, FOURTH** |
| Christopher Margaris, Melissa | ) **AMENDMENT VIOLATIONS** |
| Hammond, Martin Geller, | ) |
| | ) |
| Defendants. | ) **DEMAND FOR JURY TRIAL** |
| _____ | ) |

///

///

///

///

///

1

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

## COMPLAINT FOR DAMAGES

COMES NOW PLAINTIFF GUILLERMO SANCHEZ and allege as follows:

### I.

### INTRODUCTION

1.      The California Highway Patrol ("CHP) is a law enforcement agency. Through a long-standing custom and practice which has been in place for decades, CHP employees have been dismissed early from a variety of assignments and have compensated for a full shift.  Per this custom/practice, CHP employees receive compensation or overtime pay for the entirety of the assignment despite being dismissed early.  For decades, CHP supervisors, including the present defendants, acknowledged, ratified and condoned the custom/practice of CHP employees being dismissed early from an assignment and being compensated for a full shift.  So widespread was this custom/practice, that each of the present defendants – along with other supervisors - partook in this custom/practice throughout their CHP careers.

2.      Broadly, the CHP custom/practice of receiving compensation per assignment, whether or not the full period of the assignment was worked, includes training assignments, security assignments, overtime assignments, public relations assignments, and other official assignments.  This custom/practice was, and currently is, in place throughout the seven CHP Divisions and 102 stations across the State of California.  Two categories of such assignments were and are the Construction Zone Enhanced Enforcement Program (COZEEP) and the Maintenance Zone Enhanced Enforcement Program (MAZEEP).  Under these programs, CHP officers and supervisors would assist the California Department of Transportation ("CALTRANS") in their construction and maintenance work along California freeways and highways by providing traffic control and safety services.  CHP

**COMPLAINT FOR DAMAGES
DEMAND FOR JURY TRIAL**

employees would work these assignments on an overtime basis and would be paid by CALTRANS for an eight-hour assignment whether or not the underlying CALTRANS work lasted for the full eight hours.

3.     The purpose of this lawsuit is to demonstrate how the present defendants purposefully and wrongfully undertook a deliberate course of conduct to violate the constitutional rights of the present plaintiff by falsely accusing them of engaging in misconduct related to overtime practices and then wrongfully terminating these plaintiff's employment.  Moreover, the purpose of this lawsuit is to bring to light the hypocrisy and malice shown by the present defendants and to impose appropriate punitive damages against them so as to make examples of them and thereby prevent similar conduct by similarly situated actors in the future.

## II.

## JURISDICTION AND VENUE

4.     This civil action is brought for the redress of alleged deprivations of constitutional rights as protected by 42 U.S.C. §§ 1983, 1985, 1986, 1988, the Fourth and Fourteenth Amendments of the United States Constitution.  Jurisdiction is founded on 28 U.S.C. §§ 1331, 1343, and 1367.

5.     Venue is proper in this Court under 28 U.S.C. § 1391(b), because Defendants reside in, and all incidents, events, and occurrences giving rise to this action occurred in the COUNTY OF LOS ANGELES, California, and all of the Defendants reside in the County of Los Angeles.

6.     With respect to Plaintiff's supplemental state claim, Plaintiff requests that this Court exercise supplemental jurisdiction over such claim as it arises from the same facts and circumstances which underlie the federal claims.

///

///

///

3

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

# III.

# PARTIES

7.     At all times relevant hereto Guillermo Sanchez (hereafter also ,"Plaintiff") was an employee of the CHP, working as a patrol officer, and was terminated on or after August 1, 2019.

8.     Defendant Warren Stanley, at all times relevant here, was an employee of the CHP.  He is and, at all relevant times here, was the Commissioner of the CHP, serving as the highest-ranking member of the CHP and he had direct supervisorial authority over the present Plaintiff.  He was the final decision-maker in the termination of the present Plaintiff.  As to the actions alleged herein against this defendant, he acted with malice and/or deliberate indifference to the civil rights of each plaintiff.  Further, this defendant, at all times alleged herein, was acting within the course and scope of his employment and agency, and at all times relevant hereto was acting under the color of law.  That is, he was acting pursuant to the laws, regulations, statutes, authority, customs and practices of the State of California and the CHP. This defendant is sued individually for the violations of the present Plaintiff's civil rights which resulted from his direct actions and conduct.

9.     Defendant Daniel Minor, at all times relevant here, was an employee of the CHP.  He is and, at all relevant times here, was a Division Chief of the Southern Division of the CHP, serving as a high-ranking member of the CHP with direct supervisorial authority over the present Plaintiff.  As to the actions alleged herein against this defendant, he acted with malice and/or deliberate indifference to the civil rights of each plaintiff.  Further, this defendant, at all times alleged herein, was acting within the course and scope of his employment and agency, and at all times relevant hereto was acting under the color of law.  That is, he was acting pursuant to the laws, regulations, statutes, authority, customs and practices of the State of California and

4

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

the CHP. This defendant is sued individually for the violations of the present plaintiff's civil rights which resulted from his direct actions and conduct.

10. Defendant Christopher Margaris, at all times relevant here, was an employee of the CHP. He is and, at all relevant times here, was a station captain for the CHP ELA Station, serving as a high-ranking member of the CHP with direct supervisorial authority over the present Plaintiff. As to the actions alleged herein against this defendant, he acted with malice and/or deliberate indifference to the civil rights of each plaintiff. Further, this defendant, at all times alleged herein, was acting within the course and scope of his employment and agency, and at all times relevant hereto was acting under the color of law. That is, he was acting pursuant to the laws, regulations, statutes, authority, customs and practices of the State of California and the CHP. This defendant is sued individually for the violations of the present plaintiff's civil rights which resulted from his direct actions and conduct.

11. Defendant Melissa Hammond, at all times relevant here, was an employee of the CHP. She is and, at all relevant times here, was a lieutenant for the CHP, serving as a supervisor with the CHP ELA Station with direct supervisorial authority over the present Plaintiff. As to the actions alleged herein against this defendant, she acted with malice and/or deliberate indifference to the civil rights of each plaintiff. Further, this defendant, at all times alleged herein, was acting within the course and scope of her employment and agency, and at all times relevant hereto was acting under the color of law. That is, she was acting pursuant to the laws, regulations, statutes, authority, customs and practices of the State of California and the CHP. This defendant is sued individually for the violations of the present plaintiff's civil rights which resulted from his direct actions and conduct.

12. Defendant Martin Geller, at all times relevant here, was an employee of the CHP. He is and, at all relevant times here, was an officer/investigator for the CHP. As to the actions alleged herein against this defendant, he acted with malice and/or deliberate indifference to the civil rights of each plaintiff. Further, this defendant, at all times alleged herein, was acting within the course and scope of his

5

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

employment and agency, and at all times relevant hereto was acting under the color of law.  That is, he was acting pursuant to the laws, regulations, statutes, authority, customs and practices of the State of California and the CHP. This defendant is sued individually for the violations of the present Plaintiff' civil rights which resulted from his direct actions and conduct.

## IV.

## STATEMENT OF RELEVANT FACTS

13.    PLAINTIFF was employed by the CHP as a highway patrol officer.  His typical duties where to ensure road safety in California, protecting state buildings, conducting criminal investigations, and assisting local law enforcement agencies and operations, enforcing the California Vehicle Code, ensuring safety and public order, and writing tickets and reports when necessary and appropriate.

14.    PLAINTIFF's employment with the CHP was terminated on or after August 1, 2019.

15.    Per established CALTRANS programs, the present plaintiff would participate in the provision of safety and traffic control services for ongoing road repair and general maintenance work conducted by CalTrans.  Particularly, PLAINTIFF provided such services through the Construction Zone Enhanced Enforcement Program (COZEEP) and the Maintenance Zone Enhanced Enforcement Program (MAZEEP).   Work done under COZEEP and MAZEEP was requested by CalTrans and paid by CalTrans.  To the extent that they performed work related to these programs, each such assignment or "detail" was approved by CalTrans.   The work the present plaintiff performed related to these programs was performed for the CalTrans Bandini yard in the city of Commerce, California, as well as other CalTrans yards in the area surrounding the ELA Station.  This work was paid as overtime. The great majority of patrol officers at the ELA Station participated in providing services under these programs with the Bandini yard, and all such officers received

6

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

compensation for their work as overtime pay.   The shifts were from 6.5 hours to more than 12 hours, with most shifts being 8 hours. For each such assignment, PLAINTIFF would show up at the designated work sites and leave when instructed by a CalTrans supervisor.  CalTrans would reimburse the CHP for the COZEEP and MAZEEP overtime hours worked by CHP officers, including the present Plaintiff.

16.     Often, the work that was undertaken by CalTrans did not take up the full overtime period of the assignment.  This was acknowledged by the CalTrans and the CHP.  When PLAINTIFF was relieved early from the assignment by CALTRANS, they were subject to recall as necessary.  The present Plaintiff would return to the station and remain there for the balance of the time remaining on the overtime assignment or remain on call and available for dispatch as necessary for further CALTRANS assignment.

17.     As provided by ELA Station Standard Operating Procedure 4.5.16[1] ("SOP") that was in place from 2012 to approximately 2019, CHP officers were to be paid for the entire overtime shift of eight hours, even if CalTrans released them early, so long as they remained at the station on call until the end of the overtime shift. Also, established and accepted custom and practice was to permit officers to leave the station so long as they remained available on-call through their cell phones for the duration of their overtime shift.  This was the practice at all of the CHP stations throughout the state.

18.     Further, the SOP at the ELA Station proscribes the specific discipline to be imposed for the violation of the overtime rules: "If an officer violates the overtime

[1] Each CHP station has its own set of specific procedures which relate to, and take into account, the distinct circumstances, issues and history of that station and of the area/region that the particular station patrols.  Each SOP, such as the one at issue here, is regularly evaluated and approved by CHP command.  As with the ELA SOP that is at issue in the present matter, CHP station SOP's have the force and effect of CHP policy and CHP patrol officers can be disciplined for failing to follow their station's SOP.

7

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

policy, he/she shall be taken off the overtime rotation indefinitely." Termination for such violation is not indicated, much less required.

19. The present defendants, having ratified the custom and practice and having ratified the 2012 SOP, did not once discipline any officer at the ELA Station for claiming a full COZEEP/MAZEEP overtime detail after being dismissed early despite said defendants' actual knowledge that officers at the ELA Station, including the present Plaintiff, was participating in this practice from 2010 until the end of 2017.

20. Former Assistant CHP Commissioner, William Segal, confirmed that CHP stations throughout California run their CalTrans overtime programs the same way as the ELA Station did during the time period relevant here.

21. Defendants Warren Stanley, Daniel Minor, Christopher Margaris, Melissa Hammond and Martin Geller were aware of the custom and practice of allowing officers working COZEEP/MAZEEP assignments/details to leave early from the assignments and receive pay for the full overtime period. They, along with many of the supervisors at the ELA Station, partook in well-settled CHP custom and practice of receiving overtime pay and regular pay for time not worked, including training assignments and other assignments, in the past while working at the ELA Station or at other stations in the various CHP divisions throughout the state, or otherwise regularly benefited from partaking in assignments where they would be dismissed early and yet still receive compensation for the full shift/assignment. As stated by a former CHP Assistant Commissioner, this practice "has gone on forever."

22. Every COZEEP/MAZEEP detail worked by the present Plaintiff was documented by both the CHP and CalTrans through various documents. The CHP administration at the ELA station reviewed and reconciled the overtime hours that were worked for the present Plaintiff as well as the other ELA CHP officers who worked COZEEP/MAZEEP assignments between 2010 and 2018.

8

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

23.    To the extent that the present Plaintiff here would receive overtime pay for hours that we were not physically present at the CalTrans COZEEP/MAZEEP work location, such practice was consistent with and similar to other CHP programs where CHP officers are dismissed early from the assignment or shift and be compensated for a full shift.   Each of the present defendants condoned this practice, and were aware of, ratified, condoned and participated in many other similar practices where CHP officers and supervisors would be dismissed early from an assignment and receive full compensation as if they had completed the full shift.

24.    Examples of such similar CHP practices condoned, ratified and participated in by each of the present defendants includes POST Mandatory Training and Training Days.  A common example of this is the widespread custom/practice within the CHP where its officers are certified as having completed trainings despite not actually having completed the full period of the trainings.  The CHP conducts internal training courses in a variety of topics which CHP officers are required to complete.  Each training assignment is specified to be of a particular length of time or to contain particular contents so as to meet the training requirements of various statutes, regulations, contractual obligations, bargaining agreements and other mandatory obligations.  The CHP commonly, if not on a daily basis, allows its officers to report as having completed the full amount of training hours for a particular training despite not actually participated in the reported hours or trained on the required material.  Some of these trainings pertain to State-mandated certification requirements set by the Commission on Peace Officer Standards and Training ("POST").   Per the CHP custom/practice of dismissing its officers early from assignments, CHP officers report to required POST training assignments put on by the CHP for a mandatory training and receive less than that amount of training.  For example, some training sessions constitute a full eight-hour shift and are reported as such.  These trainings are often only 6.5 hours long, however.  Moreover, attendees

9

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

are regularly instructed to go home and "study the material" and thereby are not provided training as to the materials by CHP staff.  Officers working on 10- or 12-hour shifts benefit greatly from this practice as they are paid for their full shift despite having only attended a much shorter training shift.   Besides paying the officers for the full period of time without them having actually spent the hours at the training, the CHP also reports full compliance with the training requirements to POST so as to satisfy the POST certification requirements despite the officers not having spent the required time at the trainings.  Without this certification, CHP officers are not allowed to serve.   Through this custom and practice, as it relates to training days, the CHP falsely certifies hundreds of officers annually as having attained the various POST basic, intermediate, advanced, supervisory, management and executive certifications.  The CHP conceals this custom and practice from the Attorney General's office.

25.     Most significantly, after dismissing its officers early from POST training assignments and compensating them and the trainers as if they had completed the full shift, the CHP then falsely reports a full shift to the State Commission on Peace Officer Standards and Training so as to receive reimbursement for the training under 11 CCR, section 1005 *et seq*.  Each such individual false report to POST constitutes a violation of the California False Claims Act as each such false report constitutes the knowing presentation of a false or fraudulent claim for payment using a false record or statement material to a false or fraudulent claim.  Besides the heavy burden of the CHP reimbursing POST for such falsely obtained reimbursements, such conduct exposes each reporting/requesting person to civil liability under the Act, *section 12651, et seq*.  These false/fraudulent requests also expose the CHP to civil liability under the CFCA's Qui Tams provisions.   This false reporting is also concealed from the Attorney General's office by the CHP.

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

26.     Another example of the CHP custom/practice of dismissing officers early from an assignment and compensating them fully was the practice at former Commissioner Stanley's office where staff members were released after lunch on holidays and receive full compensation for the full day's shift.

27.     Another example of the CHP custom/practice of dismissing officers early from an assignment and compensating them fully is the CHP "Book and Out" practice whereby any officer who writes 25 tickets (a "book") can go home without completing his/her shift, but still receive pay for an entire shift.

28.     Another example of the CHP custom/practice of dismissing officers early from an assignment and compensating them fully CHP "Two for the Car" - under a DUI enforcement grant, there exists a CHP practice whereby officers in a two-man car who make two DUI arrests per shift, can go home without completing their shifts and get paid for the entire shift.

29.     Another example of the CHP custom/practice of dismissing officers early from an assignment and compensating them fully is the training under CHP's Drug Recognition Evaluator (DRE) program, where officers undergo a 36 hour (three 12-hour days) in-field certification training.  Officers undergoing this training regularly are released early as long as they are "on track" with meeting the number of evaluations needed in the three days.

30.     Another example of the CHP custom/practice of dismissing officers early from an assignment and compensating them fully CHP RADAR/"LIDAR" training: the CHP provides training in Radar and in its Light Detection and Ranging system which requires one day of training for eight hours.  The training, however, includes extended breaks during the training and the officers are released early, but are directed by their trainers to claim a full eight-hour shift.

31.     Another example of the CHP custom/practice of dismissing officers early from an assignment and compensating them fully is the CHP Radiation

11

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

Detection Training where attendees are commonly released early to "beat the traffic". Attendees are paid for time which is not spent in training.

32.    Another example of the CHP custom/practice of dismissing officers early from an assignment and compensating them fully is the CHP Street Racing Course where trainee officers are directed to claim a full eight-hour shift for four-hour training course.

33.    Another example of the CHP custom/practice of dismissing officers early from an assignment and compensating them fully is the CHP Commercial Vehicle Enforcement training where attendees are directed to leave early to "beat the traffic" but allowed to claim having attended the full course period.

34.    Another example of the CHP custom/practice of dismissing officers early from an assignment and compensating them fully are the CHP Parade and Festival Details where the CHP provides personnel for parades.  CHP officers are paid a full shift despite the events rarely lasting a full day or shift.   Examples of such assignments in the Los Angeles area include Mexican Independence Day Parade, Christmas Parade, Disabilities March, Cinco de Mayo Parade, Passion for Christ March, El Monte Health and Safety Fair, El Monte's Fourth of July Parade.  Another example of this practice is the Rose Bowl Nightside Detail where CHP officers assigned for Rose Parade and Rose Bowl safety are typically dismissed by 6:00 AM but get paid until 10:00 AM.

35.    Another example of the CHP custom/practice of dismissing officers early from an assignment and compensating them fully is are CHP Child Car-seat Technician Events where the CHP pays officers attending these Car Safety Seat events and the officers receive pre-determined hours of pay despite not working the full length of the pre-determined shift.

36.    Another example of the CHP custom/practice of dismissing officers early from an assignment and compensating them fully are CHP Public Information

12

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

Officer Events where CHP public information officers often are paid a pre-determined amount of time for assignments that do not go for the entire time period the officers are paid for.

37.    Another example of the CHP custom/practice of dismissing officers early from training assignments and compensating them fully is the CHP Special Response Team training.   The CHP's Special Response Team trains regularly.  Many of the training assignments last only a few hours but the attendees are paid for the full day.

38.    Another example of the CHP custom/practice of dismissing officers early from an assignment and compensating them fully is the common practice carried on by CHP Protection Services Division (PSD).  This CHP division provides protection services for special events which often include State of California dignitaries from various departments and offices.   PSD assignments include, for example, "airport runs" where motorcycle officers work a two- to three-hour assignment but are paid a full shift.

39.    The practice of dismissing CHP officers early from an assignment, including CALTRANS overtime assignments, and paying the officers for the full shift was long-standing and was ratified at the highest levels of CHP management. This is acknowledged by former CHP Assistant Commissioner William Siegl, former CHP Chief Art Acevedo, former CHP Division Chief Adam Cuevas, and former CHP Captain Paul Medeiros who all confirm that this custom and practice was long-standing and condoned state-wide and at the ELA Station.

40.    Defendant Melissa Hammond worked as a CHP officer at the ELA station in 2010 and 2011.  While at the ELA Station, she worked MAZEEP/COZEEP overtime assignments where she was paid for working full shifts despite being released early.  Through this personal experience, she became aware of the practice and learned that it was well-settled, ratified by her supervisors, and that CALTRANS

13

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

authorized the payment of a full shift despite the officers being released early. Defendant Hammond did not complain of the practice or otherwise bring it to the attention of her supervisors while she was assigned to the ELA station. After the ELA Station, she went to the Baldwin Park CHP station. While there, she learned that the same MAZEEP/COZEEP overtime was in place at that station. She then transferred to the CHP Southern Division Headquarters. There, although knowing of the MAZEEP/COZEEP overtime that was in place at the ELA Station, she did not report it to her supervisors or otherwise bring attention to the practice.

41.    While at the CHP Southern Division Headquarters, defendant Hammond worked with defendant Daniel Minor where they became close friends and confidants.

42.    In 2016, defendant Hammond returned to the ELA Station as a lieutenant.

43.    In 2017, defendant Hammond was responsible for enforcing an overtime reduction at the ELA station and the overtime limits were reduced to 6.5 hours and then increased to 7.5 hours. If the officers were released early from an overtime detail, they were subject to recall. In November of 2017, defendant Hammond unilaterally decided to cancel all weekend overtime assignments; i.e., overtime work on Friday and Saturday nights. Although she attributed this to high DUI rates and the dangers to CHP officers on overtime shifts, defendant Hammond admitted to a co-worker/sergeant that she canceled the weekend overtime details because she believed that the weekend graveyard sergeant was not managing the weekend details properly.

44.    In March of 2018, plaintiff James Horejs and the ELA Station union representative filed a grievance regarding defendant Hammond's unilateral cancellation of weekend overtime details. Part of the grievance process included an informal discussion with his supervisors. Thereafter, and in a timely fashion, James J. Horejs had an informal discussion with his supervisors regarding his complaint

14

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

regarding Lt. Melissa Hammond improperly denying services to CalTrans, improperly changing well-settled past practices with respect to overtime and failing to comply with state law and CHP policy with respect to changing a practice that had existed for more than 17 years.   In approximately 5 days, his supervisors responded that the grievance was denied.  No reason for the denial was given. No written response was provided.

45.    Thereafter, and in a timely fashion, James J. Horejs filed a written grievance/complaint where he made complaints against Lt. Melissa Hammond alleging that she was improperly denying services to CalTrans, improperly changing well-settled past practices with respect to overtime and failing to comply with state law and CHP policy with respect to changing a practice that had existed for more than 17 years.

46.    The grievance/complaint that James J. Horejs filed regarding Lt. Hammond's spells out the specific activities as follows:

a.    That Lt. Hammond improperly denied request from CalTrans to provide CHP services on Friday and Saturday overnight details citing that it was "too dangerous" given the higher than normal intoxicated drivers on weekend evenings.

b.    That Lt. Hammond improperly imposed limitations and improperly denied service requests in violation of "Past Practices" provisions which state that "past practices" may take precedence over a written policy if the practice complies with certain conditions.

c.    That Lt. Hammond improperly failed to meet and confer with the Employee Organization Representative for the California Association of Highway Patrol Representative, Thomas Santiago in regard to the changes in practices and in the limitations on overtime that she imposed.

15

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

47. Upon learning of this grievance, Lt. Hammond was enraged by the grievance's contents and allegations, as it was directed at her and accused her of improprieties. Moreover, the remedy sought in the grievance called for Lt. Hammond to cease and desist from participation in the management of the ELA Station's overtime program. The grievance caused Lt. Hammond to become enraged. In a subsequent meeting with Mr. Horejs' Union Representative, Thomas Santiago, where they discussed the grievance, Lt. Hammond became further angered and enraged at the allegations and tone of the grievance. Upon learning of the grievance, defendant Hammond was heard in her office irately yelling profanities.

48. Thereafter, Lt. Hammond telephoned her friend and confidant, defendant Daniel Minor, who was then the Chief of the Southern Division, and informed him of the grievance. The grievance had the same impact on defendant Daniel Minor. He came to the ELA Station and he was also was enraged by the grievance's tone and content. Defendant Minor met with defendant Hammond in her office with another sergeant and defendant Minor indicated to defendant Hammond that he would conduct an audit of the overtime at the ELA Station and that he would use his own handcuffs to arrest both plaintiff Horejs and the CHP officers' union representative. He also stated that the rest of the CHP officers at the ELA station would be "collateral damage".

49. After defendant Minor left Hammond's office, Hammond stated to station sergeants that Assistant Chief Minor was about to undertake a retaliatory action against the ELA Station officers who worked the CalTrans overtime assignments. She indicated that Assistant Chief Minor was going to "burn down the forest to get two trees"; that is, that through the audit and investigation, Assistant Chief Minor was going to identify, investigate and retaliate against James J. Horejs and the other officers at the ELA Station who took CalTrans overtime assignments so as to take reprisals against James J. Horejs and the other union representative.

16

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

50.     Thereafter, between March 2018 defendant Minor repeatedly conferred in person and over the phone with defendant Christopher Margaris to discuss the overtime practices at the ELA station and to develop a plan to wrongfully and improperly terminate the employment of plaintiff James Horejs for complaining about defendant Hammond's efforts regarding overtime and to carry out a plan to terminate the employment of any other ELA CHP officer who worked a COZEEP/MAZEEP overtime detail where that officer was paid a full eight hours for the detail that was cancelled early by CALTRANS.

51.     During March and April of 2018, defendants Minor and Margaris arrived at and agreed on a plan to carry out their purging of CHP officers from the ELA station.  During their discussions, defendants Minor and Margaris shared their plan with defendant Warren Stanley who was the senior person in charge of the CHP. Minor and Margaris had to secure Stanley's consent to their wrongful plan as defendant Stanley would have to sign-off on and authorize the termination of each ELA Station officer that was targeted, including the present Plaintiff.

52.     Defendant Stanley was also aware of the well-settled practice throughout the CHP of allowing personnel to claim time for hours not worked.  He, for example, had been to many training sessions over his career where the attendees were released early from the training session and allowed to claim the full period of the training session.  Defendant Stanley also had a practice during the year-end holidays where he would allow his administrative staff to leave early from work and allow them to claim the full daily time as if they had worked all day.  Defendant Stanley agreed to participate in the plan devised by defendant Minor and Margaris and authorize the firing of the majority of the ELA Station personnel despite knowing that he would be disciplining and terminating CHP officers at the ELA station for conduct that the CHP had permitted, authorized and ratified over the years.  Defendant Stanley also wanted to "change the culture" at the ELA station.  That is, Stanley wanted to remove

17

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

the Hispanic/Latino influence at the ELA station's management and reign in what he perceived was a strong influence of the Hispanic/Latino officers at the ELA Station. The ELA Station, because of its geographic location in a primarily Hispanic region of Los Angeles, had over the years been a draw to many Hispanic/Latino officers who felt a sense of pride working there and who conducted themselves in a culturally sensitive way in carrying out their duties and in their policing of the Hispanic/Latino community that they worked in. Over the years, most of the officers at the ELA Station learned of the "ELA way" which took into account the culture of the community that they were policing. Stanley, Minor and Margaris were insensitive to the Latino-focused community-based policing that was being informally carried out at the ELA Station. Defendants Stanley, Minor, Margaris and Hammond spoke of "changing the culture" as a way of expressing their antipathy toward the ELA Station officers who they would be dismissing from their jobs as CHP officers.

53. Defendants Stanley, Minor, Margaris and Hammond knew that terminating the employment of the officers at the ELA station, including the present defendants, for claiming a COZEEP/MAZEEP overtime detail when released early was improper, unconstitutional and violated the Standard Operating Procedure for the ELA station. Terminating their employment on such grounds would was improper because the CHP; 1) did not have a clear policy against the practice, 2) the ELA officers, including the present defendants, did not have notice of such a policy, and 3) the CHP had no intention enforce any such policy. Moreover, the CHP and management at the ELA Station had permitted this practice for approximately 17 to 20 years with literally thousands of hours of such overtime being taken by ELA station officers annually. Likewise, the CHP, the present defendants and ELA station management never discipline any officers for having engaged in this practice over the 17 to 20 year history of the practice being in place at the ELA Station.

18

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

54. After they developed their wrongful plan to dismiss the vast majority of the ELA Station officers, the audit of the COZEEP/MAZEEP overtime details that defendant Minor had threatened was undertaken for the purpose of wrongfully punishing the present Plaintiff and other ELA CHP officers.

55. Defendants Stanley, Minor and Margaris agreed to limit the scope of the audit to only include a short period of time prior to the grievance/complaint that James J. Horejs filed.   Before doing so, they consulted with defendant Stanley as to their plan, it purpose, and their desire to "change the ELA Station's culture."   They all agreed that by limiting the scope of their investigation to a short period, they would not implicate senior officers who had moved through the ELA Station as patrol officers and worked the COZEEP/MAZEEP overtime details at the ELA Station but were now sergeants, lieutenants, captains and other high-ranking officers in the CHP. Lieutenant Hammond was one such officer.  Although she worked COZEEP/MAZEEP overtime details while a patrol officer at the ELA Station in 2010 and 2011 and claimed full details where she was released early by CALTRANS as the present defendants did, she would not be investigated for overtime violations because the investigation would not look at overtime records further back than 2017. Other CHP supervisors that were protected from the investigation's scope were sergeant Keith Phillips and sergeant Kelly Moore.

56. The audit and investigation was carried out under the oversight of defendant Margaris.  He regularly reported to defendants Minor and Stanley.  The investigations followed an agreed-upon format which defendants Stanley, Minor and Margaris devised and authorized.  The subject officer would be called in for an interview where both criminal investigators and administrative investigators would be present.  The subject would be Mirandized. Once the subject officer asserted his or her Fifth Amendment rights and other rights, the criminal investigators would leave. The administrative investigators would then threaten the subject officer with

19

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

dismissal if he/she failed to answer the questions. Upon threat of termination, the officer would be compelled to answer all questions. Thereafter, the administrative investigators would share information with the criminal team in violation of the subject officer's Fifth and Fourteenth Amendment rights.

57. After devising their plan and starting the investigation, these defendants discussed and agreed to carry out a press conference to announce the findings and for the purpose of damaging the present Plaintiff's reputation and prejudicing their civil rights. The defendants made statements at the press conference, or allowed statements on behalf of the CHP to be made, that were against CHP protocol, which only allows for a brief general statement in order to maintain the integrity of the investigation and to respect the rights of the accused. Said defendants' false statements and exaggerations were inappropriate, damaged public trust, and damaged the reputation of the present Plaintiff. The press conference and the statements made by these defendants were approved by each defendant to this action and were ratified expressly and impliedly by defendant Stanley.

58. As the investigations continued, defendants Stanley, Minor and Margaris, and each of them, had the authority to audit records going back to as far as 2007, but deliberately chose not to do so. By limiting their audit to the two previous years they would be able to capture only recent overtime activity of CHP officers, including his participation. By thus limiting their audit, they protected other higher-ranking officers, including many of their friends in the CHP, who had also participated in and benefited from this overtime practice but who had done so more remotely in time. In other words, by limiting the audit to only the two prior years, they would exclude from the audit many CHP officers who had risen to the rank of lieutenant and above, who had engaged in this overtime practice longer than two years prior. Before undertaking the audit, they discussed their plan and its rationale with defendant Stanley. He ratified the limited scope of the plan and agreed that

20

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

doing so would protect the supervisorial staff from discipline for having partaken in the MAZEEP/COZEEP programs as the present Plaintiff has.

59. Had the defendants audited records older than two years, Lt. Hammond herself would have been subject to investigation and discipline similar to the present Plaintiff because she worked 12 overtime shifts in the MAZEEP/COZEEP programs in 2010 and 2011. In her statement to investigators, for example, she admitted working only one such detail and falsely claimed to have not worked more such details because of the impropriety of taking overtime for time not worked.

60. Defendants Stanley, Minor and Margaris kept defendant Hammond apprised of their progress in the carrying out of their plan and she kept them apprised of how their efforts were being received at the ELA Station. Between March and October of 2018, for example, defendant Hammond had several conversations with her sergeant, Connie Guzman, where defendant Hammond explained that they would be limiting the investigation to two years to avoid ensnaring supervisors they wanted to protect. Eventually, Hammond admitted that she was "tapped on the shoulder" (i.e., a euphemism for being selected for a coveted assignment or promotion) and that she would be transferred to Southern Division Headquarters Administration, an assignment that usually leads to a promotion to captain. Defendant Hammond was protected and promoted for her willingness to cooperate with, and participate in, the plan that defendants Stanley, Minor and Margaris had devised.

61. The audit in question was begun on March 22, 2018 and administrative and criminal investigations into the false allegations of fraud and abuse of overtime procedures at the ELA CHP station started shortly thereafter. Without notice to the present Plaintiff, the CHP and defendants Stanley, Minor, Margaris and Martin Geller sought search warrants of PLAINTIFF's cell phones. The affidavits filed in support of the search warrants by Martin Geller and other DOE defendants falsely alleged that the PLAINTIFF engaged in theft and embezzlement and had falsified public

21

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

records.   Defendant Martin Geller was brought into the conspiracy to fire the present defendants and other ELA CHP officers by defendant Margaris, who informed Geller of their intention to "clean house" and get rid of the "ELA culture" at the ELA Station.  Defendant Geller agreed to participate in the plan by filing false affidavits to support search warrant applications as part of the investigation of the ELA Station overtime activities. The present defendants had the supporting affidavits sealed in their entirety to prevent the present Plaintiff from the learning of their misconduct, and notice of the search warrants was withheld by the present defendants in order to conceal defendants' misconduct in their efforts to obtain cell phone and other electronic data from PLAINTIFF.

62.    PLAINTIFF did not learn of the false contents of the affidavits until after August 11, 2020 when the search warrants and affidavits were unsealed.

63.    The affidavits filed by defendant Martin Geller falsely indicated:

a.    that the present Plaintiff was wrongfully taking MAZEEP/COZEEP overtime hours,

b.    that the present Plaintiff was engaging in criminal activity,

c.    that defendant Melissa Hammond was unaware of such practices occurring at other CHP stations,

d.    that Melissa Hammond had recently found that officers at the ELA station were wrongfully taking MAZEEP/COZEEP hours, and

e.    that Melissa Hammond's findings were the cause of an audit of the MAZEEP/COZEEP overtime practices at the ELA CHP station.

64.    The affiants, including defendant Martin Geller, also knew of and deliberately withheld material information from the magistrate regarding the MAZEEP/COZEEP overtime program at the ELA Station.  Had the magistrate been informed of the 2012 SOP, the long accepted practices at the ELA Station regarding MAZEEP/COZEEP overtime, and the well-settled acknowledgement, ratification and

22

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

authorization of such conduct by and practices by the ELA Station's supervisory/management staff, the magistrate would not have found probable cause.

65. The information that the affiants, including Martin Geller, knew of and deliberately withheld from their affidavits included:

a.  the existence of the 2012 ELA SOP which specifically allowed the conduct that the present Plaintiff was accused of;

b.  that the conduct which Plaintiff was accused of in the affidavits was acknowledged, ratified and authorized as an established custom and practice by the ELA Station supervisory/management staff, including sergeants, lieutenants, and captains;

c.  that the conduct that Plaintiff was accused of in the affidavits had been engaged in by the vast majority of the ELA Station sworn personnel since at least 2000;

d.  that, despite the knowledge of this practice by the ELA Station supervisory staff since at least 2000, no ELA officer who engaged in the conduct which Plaintiff was accused of in the affidavits was ever administratively disciplined in any way, barred from partaking in overtime as called for in the 2012 SOP, criminally investigated or referred out for prosecution by the Los Angeles County District Attorney's office;

e.  that supervisory/management staff which had worked at the ELA Station previously had also partaken in the MAZEEP/COZEEP overtime program at the ELA Station in the same way as the present Plaintiff was accused of;

f.  that since 2000, for every instance that the present Plaintiff was accused of wrongfully taking overtime, a CALTRANS supervisor authorized the

23

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

present Plaintiff to take the full amount of overtime that they sought overtime compensation for;

g.    that CALTRANS reimbursed the CHP for all of the overtime paid to the present Plaintiff;

h.    that for every MAZEEP/COZEEP overtime detail that was worked by the present Plaintiff and by other ELA Station personnel, supervisory staff at the ELA Station undertook a detailed review and reconciliation of the supporting overtime documentation submitted to support the request for overtime, and approved every MAZEEP/COZEEP overtime request made by the present Plaintiff;

i.    that the affiant's principle witness, Melissa Hammond, also partook in the conduct which Plaintiff was accused of in the affidavits and that she was not being criminally investigated as the present Plaintiff was.

66.    The audit of the COZEEP/MAZEEP overtime details was a sham in that the present defendants knew about the COZEEP/MAZEEP overtime practices that were in place and had authorized the practices.  As noted above, after the audit, the present defendants undertook interrogations of a large number of officers at the ELA Station, including the present Plaintiff.  The questioning was part of an administrative and criminal investigation that was conducted jointly.  Information between the administrative and criminal investigators was improperly shared in violation of his rights under the Peace Officers' Bill of Rights and the United States and California Constitutions.

67.    The present Plaintiff was thereafter terminated for having participated in the COZEEP/MAZEEP overtime program.  Defendant Stanley alleged in Plaintiff' respective Notice of Adverse Action that was served upon them that they were paid overtime in the COZEEP/MAZEEP program for time that they did not work and for

24

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

time that they were not entitled to.   Defendant Stanley knew these allegations were false.

68.     Plaintiff was unlawfully and unconstitutionally terminated in violation of their due process and Fourth Amendment rights as they complied with the SOP requirements for the COZEEP/MAZEEP overtime assignments and the established customs and practices in place at the ELA station.  Moreover, their termination was undertaken in retaliation for Mr. Horejs' filing of the underlying grievance/complaint.

69.     These terminations were improper because the taking of overtime as was done at the ELA Station's COZEEP/MAZEEP overtime details was a well-settled and authorized practice at the ELA Station that was in place since 2000.

70.     At no time while they were working the COZEEP/MAZEEP assignments during the time that was covered in the audit were the present Plaintiff informed or given notice of a change in the 2012 SOP and in the CHP's custom and practice of allowing officers working these details to leave early from the assignments and receive pay for the full overtime period.  Had the present Plaintiff been informed of a change in the custom and practice, they would have complied with the changes to the custom/practice and/or in the 2012 SOP.

71.     Ultimately, the present Plaintiff adhered to the SOP requirements and provisions regarding COZEEP/MAZEEP assignments and complied with the established and long-standing custom/practice regarding COZEEP/MAZEEP assignments for those dates/hours that the CHP has accused him of not having worked and having improperly taken overtime for.

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

## V.

## FIRST CAUSE OF ACTION

### DUE PROCESS VIOLATION

### DELIBERATE INDIFFERENCE TO CONSTITUTIONL RIGHTS

### AS AGAINST ALL DEFENDANTS

72.     Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

73.     This action is brought pursuant to 42 U.S.C. §1983 and §1985 for violation of Plaintiff's rights under the Fourteenth Amendment of the U.S. Constitution.

74.     Each plaintiff had a meaningful property and liberty interest in his employment with the CHP that was recognized by state and federal law as well as existing state and federal precedent.  Through the actions of the present defendants, the due process rights of the present Plaintiff was violated.  In fact, the action of the present defendants, as presented herein above, was done for improper purposes, was clearly arbitrary, and had no substantial relation to the public health, safety, morals or general welfare.

75.     As alleged herein above, defendants and each of them, planned and carried out a specific course of wrongful, illegal and unconstitutional conduct so as to punish and otherwise wrongfully discipline the present Plaintiff.

76.     For at least 17 years the present defendants, partook in, acknowledged, ratified, and otherwise sanctioned the taking of overtime under the COZEEP and MAZEEP programs as the present Plaintiff did.   Like many other CHP trainings and programs, CHP employees are and were allowed to be dismissed from an assignment and receive full compensation without threat or fear of reprisals or discipline. Despite this long history of ratification of the practice of taking a full eight hours of COZEEP/MAZEEP overtime when released early by CALTRANS and despite

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

knowing that the ELA Station personnel, including the present defendants, were participating in this practice, the present defendants failed to warn or otherwise notify the ELA station personnel, including the present defendants, of their intentions to no longer allow this practice.   This, without giving the formal and required notice under the

77.   Instead, the defendants undertook a deliberate plan to discipline and otherwise punish the present Plaintiff regarding their participation in COZEEP and MAZEEP without giving notice to Plaintiff that the preexisting custom/practice was no longer in effect and that they were not allowed to receive compensation for the full shift if dismissed early.  Moreover, the present defendants, after having allowed the present Plaintiff to take COZEEP and MAZEEP overtime during 2015, 2016 and 2017 pursuant to the established and condoned custom and practice, they selectively applied a new policy barring such custom/practice retroactively so as to punish and otherwise wrongfully discipline the present Plaintiff, including seeking out and securing their termination.

78.   The present defendants did all of this maliciously and with the intent of causing the present great personal harm and hardship.

79.   As a further direct and proximate result of the aforementioned acts alleged herein above, the present Plaintiff was significantly and permanently injured and have suffered great financial losses and expense related to the loss of his jobs.

80.   As a further direct and proximate result of the aforementioned acts alleged herein above, the present Plaintiff has suffered the loss of earnings and wages and has suffered the permanent loss of his capacity to earn wages due to the great stain on his law enforcement employment history.

81.   As a further direct and proximate result of the aforementioned acts alleged herein above, the present Plaintiff has been unnecessarily subjected to great

27

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

physical and psychological pain and suffering and will continue to suffer such great physical and psychological pain and suffering for the balance of his lives.

82.    The conduct of the individual defendants, as alleged above, was done with deliberate indifference to the constitutional violations endured by the present Plaintiff.  Said defendants knew, or should have known, that their conduct was wrongful, illegal and unconstitutional and that it would seriously injured the present Plaintiff.  As such, punitive damages should be imposed, in an amount sufficient to punish each of them and to deter future similar conduct by said defendants and others in similar positions.

## VI.

### SECOND CAUSE OF ACTION
### FOURTH AMENDMENT VIOLATION
### ILLEGAL SEARCHES
### AS AGAINST ALL DEFENDANTS

83.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

84.    This action is brought pursuant to 42 U.S.C. §1983 and §1985 for violation of Plaintiff's rights under the Fourth, Fifth and Fourteenth Amendments of the U.S. Constitution.

85.    Each plaintiff had a meaningful property and liberty interest in his employment with the CHP that was recognized by state and federal law as well as existing state and federal precedent.

86.    In an effort to carry out an unlawful and wrongful plan to dismiss the present Plaintiff from his employment with the CHP, the present defendants surreptitiously sought search warrants to allow them to access Plaintiff' cell phone records and other electronic data records.

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

87. Defendants Stanley, Minor, Margaris and Geller knew that the "illegal conduct" which was the focus of the criminal investigation that they were conducting was not illegal and was not improper. This conduct, the taking of a full MAZEEP/COZEEP overtime detail when released early from that detail by CALTRANS, was a well-settled, ratified, acknowledged and permitted practice at the ELA Station and at other CHP stations in California. They also knew that the SOP in place at the ELA Station since 2012 permitted this practice. Accordingly, these defendants knew that such conduct did not constitute a crime and that there was no probable no probable cause to obtain the cell phone and electronic data records from Plaintiff.

88. Despite this knowledge, said defendants wrongfully sought search warrants for such records and filed, or had others file, knowingly false affidavits in support of the requests for search warrants.

89. Moreover, the said defendants engaged in judicial deception by intentionally or recklessly withholding materials facts from the magistrate. The withheld information, as described herein above, was material to the finding of probable cause in that it would have informed the magistrate of the true nature of the overtime practices in place at the ELA Station, the ratification and acknowledgment of such practices by the supervising officers of such practice at the ELA Station and the general acceptance of such practice by the CHP over decades.

90. Said defendants intentionally misled the magistrate when applying for the warrant, and had the magistrate considered all of the facts, the magistrate would not have found probable cause.

91. After wrongfully obtaining the phone and electronic data records, said defendants used the records to buttress their malicious plan to dismiss the present Plaintiff from their employment. After wrongfully obtaining such data and records, they cited and relied upon the wrongfully obtained records in the Notice of Adverse

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

Action issued to each of the present Plaintiff, used the data and records in their interrogation of each of the present Plaintiff, and eventually relied on this wrongfully obtained data and records to dismiss each of the present Plaintiff from their employment with the CHP.

92.    Such conduct violated the present Plaintiff's rights under the Fourth, Fifth and Fourteenth Amendments of the U.S. Constitution.

93.    The present defendants did all of this maliciously and with the intent of causing the present great personal harm and hardship.

94.    As a further direct and proximate result of the aforementioned acts alleged herein above, the present Plaintiff was significantly and permanently injured and has suffered great financial losses and expense related to the loss of his jobs.

95.    As a further direct and proximate result of the aforementioned acts alleged herein above, the present Plaintiff has suffered the loss of earnings and wages and has suffered the permanent loss of his capacity to earn wages due to the great stain on his law enforcement employment history.

96.    As a further direct and proximate result of the aforementioned acts alleged herein above, the present Plaintiff has been unnecessarily subjected to great physical and psychological pain and suffering and will continue to suffer such great physical and psychological pain and suffering for the balance of his lives.

97.    The conduct of the individual defendants, as alleged above, was done with deliberate indifference to the constitutional violations endured by the present Plaintiff.  Said defendants knew, or should have known, that their conduct was wrongful, illegal and unconstitutional and that it would seriously injured the present Plaintiff.  As such, punitive damages should be imposed, in an amount sufficient to punish each of them and to deter future similar conduct by said defendants and others in similar positions.

30

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

# VII.

## **PRAYER**

Wherefore, Plaintiff demands the following relief, against all the Defendants with respect the above claim for relief:

a.   Compensatory general and special damages in an amount in accordance with proof;

b.   Reinstatement, by defendant CHP;

c.   Punitive and exemplary damages as to each individual defendant in an amount sufficient to deter and to make an example of these defendants;

d.   Reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. §1988;

e.   Costs of suit necessarily incurred herein; and

///

///

f.   Such further relief as the Court deems just or proper, including interest, and the value of lost benefits.

Dated: July 30, 2021                    CASILLAS & ASSOCIATES

                                        By: _/s/   Arnoldo Casillas_
                                        ARNOLDO CASILLAS
                                        Attorneys for Plaintiff Guillermo Sanchez

31

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

## DEMAND FOR JURY TRIAL

COMES NOW Plaintiff Guillermo Sanchez and respectfully demands that the present matter be set for a jury trial.


Dated: July 30, 2021                    CASILLAS & ASSOCIATES


By:  /s/   Arnoldo Casillas
ARNOLDO CASILLAS
Attorneys for Plaintiff Guillermo Sanchez

32

**COMPLAINT FOR DAMAGES
DEMAND FOR JURY TRIAL**